**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| FRANCISCA TORRES, Individually, | ) | |
| And as Personal Representative of the, | ) | |
| Estate of MARIO TORRES-GOMES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-196-JHP-FHM |
| | ) | |
| DALE WHITE, an individual; | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is Defendant White's Errata Motion For Summary Judgment [Doc. No. 41],

Plaintiff's Response To Defendant's Motion For Summary Judgment And Brief In Support [Doc.

No. 111], and Defendant White's Reply To Plaintiff's Response To Motion For Summary Judgment

[Doc. No. 113]. For the reasons stated herein, this Court finds there are material issues of fact to

preclude summary judgment and as such, Defendant's Motion For Summary Judgment is **DENIED**.

## BACKGROUND

On April 11, 2007, Defendant White and other members of the Tulsa Police Department

were investigating two armed robberies. Initially, Officer Michael Eubanks was assigned to

investigate a burglary that "just occurred" at the Bradford Creek Apartments, in Tulsa, Oklahoma.

The suspects were two black males who forced their way into an apartment occupied by the victims,

robbed them at gunpoint and assaulted them. Defendant White began patrolling the streets searching

for the two robbery suspects when he received a call regarding a second robbery at the Sierra Pointe

Apartments in Tulsa, Oklahoma. Defendant White responded to the call. Again, the suspects were

reported to be two African-American males who had robbed and brutally beaten a maintenance man

leaving him locked in a tool shed on the premises. The suspects were reported to be wearing black hoodies and black pants, were clean shaven and were approximately 17-18 years of age. One of the suspects was reportedly 5'8" tall, while the other was 5'6". The taller one was reported to be carrying a black semi-automatic weapon. The suspects were seen leaving on foot.

The maintenance man who was the victim of the second attack stated he could not identify his attackers as people he knew by name. He told the police officers that he did not know if they lived in the apartment complex, but he had seen them hanging around before.

K-9 officer Bob Curry and his dog, Ceasar, began tracking the suspects. Ceasar tracked to 1370 S. 107th E. Avenue, Apartment A. Officer Charles Tapper advised over the radio dispatch that they were about to knock on the door to Apartment A. Immediately thereafter, Corporal Brian Collum came over the radio announcing "Jumped out the window. They just jumped out the window." Mario Torres-Gomes jumped out the rear window of the apartment and was running towards U.S. Highway 169. Corporal Collum and Officer Cole Butler chased the suspect to an iron rod fence that separated the apartment complex from the area near the highway. Torres-Gomes slipped through a hole in the fence and continued to run west across Highway 169. Corporal Collum stated over the radio dispatch:

> He's taking the, he's running onto the 44 off ramp. Hispanic male, blue jeans, long white shirt, bald head with, looks like a goatee. Hey, Cole, he just took the off ramp the ramp to 44. He ducked around that wall right there.

Defendant White pursued Torres-Gomes in his vehicle. During this pursuit Sergeant Michael Eubanks asked over the radio dispatch "What'd we want him for?" to which Corporal Collum responded, "came out of the apartment, of an apartment we were checking for armed robbery suspects."

Defendant White states that during his pursuit of the suspect he gave several commands in a loud voice yelling at the decedent, "Halt! Stop! Don't do it!"[1] He states that after these commands Torres-Gomes looked up at him but failed to cooperate. Officer White states he believed Torres-Gomes had a gun under his shirt because he was facing towards Officer White with both hands underneath his shirt pushing the shirt out with his hands and pretending to hold a gun while ignoring White's commands. Officer White states Torres-Gomes' shoulders were still square to him when he fired his gun.

Shortly after the pursuit began, Defendant White fired one shot which struck Torres-Gomes in the back of the head fatally wounding him. The decedent was determined to be unarmed at the time of the shooting. Officer Curry and his dog Ceasar searched the route taken by the decedent for anything that was dropped along the way and nothing was found.

The Plaintiff disputes the Defendant's version of the events immediately preceding the shooting. The Plaintiff provided this Court with, among other things, the medical examiner's report which indicates the bullet entry point was approximately the center of the back of the decedent's skull.

## PROCEDURAL BACKGROUND

On April 7, 2008, Plaintiff filed this lawsuit naming Officer John Doe as the sole defendant

---

[1]The parties are in dispute regarding the events immediately preceding and leading up the shooting. Although the Court makes note of the statements provided by the Defendant and various eye witnesses, for purposes of determining the validity of the summary judgment motion, all facts are looked at in the light most favorable to the non-moving party, in this case, the Plaintiff. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Casey v. City of Fed. Heights,* 509 F.3d 1278, 1279 n. 1 (10th Cir.2007).

alleging the officer used deadly force against her son in violation of his First, Fourth, Fifth, Eighth, Fourteenth, and Fifteenth Amendment rights. On August 14, 2008, Plaintiff filed an Amended Complaint naming Officer Dale White as the only defendant. On January 6, 2009, the Court entered an Order dismissing all of Plaintiff's claims other than the Fourth Amendment claim. On June 8, 2009, Defendant filed the current Motion for Summary Judgment, asserting that he is entitled to qualified immunity.

Also pending in this case is a Motion In Limine By Defendant Dale White [Doc. No. 108] to exclude from consideration by this Court during its review of the motion for summary judgment Plaintiff's expert report as being improperly disclosed pursuant to Fed. R. Civ. P. 26(2)(b). The Motion In Limine also asks that this Court refuse to a newspaper article submitted by the Plaintiff as improper hearsay. The Plaintiff submitted a Response In Opposition to Defendant's Motion [Doc. No. 115] and the Defendant Submitted a Reply Brief on this matter. [Doc No. 121] This Court agrees with the Defendant that the submitted newspaper article is inadmissible hearsay pursuant to Fed. R. Evid. 801 and therefore, it was not considered by this Court in evaluating the pending Motion For Summary Judgment. This Court also concludes that the Plaintiff's expert report was timely disclosed under the Federal Rules of Civil Procedure as this Court did not set a specific time frame for the identification of expert witnesses or the exchange of witness reports. Absent a specific date set by the Court or a stipulation by the parties, Fed. R. Civ. P. 26 (B)(2)(C)(i) dictates that disclosure of experts must be made 90 days before trial. Since there was no trial date set in this matter, Plaintiff's disclosure was timely.

Defendant further argues this Court should strike the Plaintiff's report on the basis the opinion supplied by the expert does not properly assist the trier of fact as required by Fed. R. Evid.

702. This Court finds it unnecessary to reach a ruling on this matter at this time. The Plaintiff's expert report was not considered in determining the merits of the Defendant's Motion For Summary Judgment. Even without the Plaintiff's expert report, this Court finds the Plaintiff has provided sufficient evidence to warrant a denial of Defendant's Motion For Summary Judgment. As such, a Scheduling Order will be entered in this case which will allow time for both sides to obtain experts for trial and to make any challenges to these experts or their opinions which the parties feel are appropriate.

## DISCUSSION

**A.      Summary Judgment Standard**

A motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).   The Defendant moves for summary judgment claiming he is entitled to qualified immunity. Qualified immunity shields officers from suit for official acts, as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 201-202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)(internal citations omitted). As a result, The Supreme Court has repeatedly stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.*

This Court's review of summary judgment motions in the qualified immunity context differs

from that applicable to review of other summary judgment motions. *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citing *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009)); *see Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Whittier v. Kobayashi,* 581 F.3d 1304, 1307 (11th Cir.2009). In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *see Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir. 2009)(noting that generally "we accept the facts as the plaintiff alleges them"). "[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record. . ." *Thomson v. Salt Lake County,* 584 F.3d 1304, 1312 (10th Cir.2009)(internal citations omitted); *see also Estate of Larsen ex rel. Sturdivan v. Murr,* 511 F.3d 1255, 1258 (10th Cir.2008).

If the Plaintiff is successful in demonstrating that Officer White violated a clearly established constitutional right, then the burden shifts back to the Defendant, who must prove that "no genuine issues of material fact" exists and that the Defendant "is entitled to judgment as a matter of law." *Gross v. Pirtle,* 245 F.3d 1151, 1156 (10th Cir.2001). Therefore, the Defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. *See Olsen v. Layton Hills Mall,* 312 F.3d 1304 ,1312 (10th Cir. 2002) citing *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir. 2002). "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary

judgment based on qualified immunity should be 'properly denied.'" *Olsen,* 312 F.3d at 1312 citing *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir.1991).

Prior to the Supreme Court's decision, in *Pearson*, courts were mandated, by *Saucier,* to engage in a structured two-step "sequence for resolving government officials' qualified immunity claims." This means the Court first decided whether "the facts alleged show[ed] the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. Following this inquiry, a court had to determine whether the right violated was clearly established when violation occurred. *Id. Pearson* modified this formula, by reconsidering *Saucier's* "rigid order of battle." *Pearson*, 129 S.Ct. at 815. As a result, district courts may "exercise their sound discretion in deciding which of the two prongs" to address first. *Id.*

Given this choice, this Court opts for the *Saucier* procedure. Having done so, the Court must first determine "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 200. Using this standard, this Court finds the Plaintiff has shown a constitutional violation.

**B.      Did the use of force constitute a constitutional violation?**

In the first step of the qualified immunity analysis the plaintiff must first "demonstrate that the defendant's actions violated a constitutional or statutory right." *Nelson v. McMullen,* 207 F.3d 1202, 1206 (10th Cir.2000) (quotation omitted). In doing so the courts look at the reasonableness of the Officer's conduct. In this analysis the Court asks whether the officer's actions were "'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

An officer's use of deadly force is subject to this reasonableness requirement. *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Reasonableness "must be judged from the perspective of a reasonable officer on the scene," who is "often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-397. The Supreme Court has held that, "where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner,* 471 U.S. at 11.

As the Tenth Circuit noted in *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009), "[t]here is no easy-to-apply legal test for whether an officer's use of deadly force is excessive; instead, we must slosh our way through the fact-bound morass of 'reasonableness." (Internal citations omitted) In doing so, we must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* Some of the factors Courts have found useful when conducting this analysis include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. citing *Weigel v. Broad*, 544 F.3d 1143, 1151-52 (10th Cir.2008).

When Officer White was asked in his deposition why he felt deadly force was justified he gave the following reasons:

> Q:     Okay. At the time that you took the show, why do you feel deadly force was justified?
> A:     Two reasons. I was in immediate danger of being fired on, as were the officers behind me. And the second is because I had a very violent fleeing felon that I could not allow to escape and maybe carjack somebody or maybe engage all of the

officers once he got behind that concrete.
[Doc. No. 111-3, pg. 15]

There is no question here that the decedent, Mario Torres-Gomes, was fleeing or actively resisting arrest.  However, the fact that a suspect is fleeing, alone does not justify the use of deadly force.  The Supreme Court made this fact clear in *Garner* by stating:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.  It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.
> *Garner*, 471 U.S. at 11.

There is disagreement between the parties regarding whether it was reasonable for the Defendant to believe Torres-Gomes, was a possible suspect in the two burglaries and violent assaults the police were investigating.  The Plaintiff argues that, although the decedent was fleeing from the police, there was no reason to connect him to the robberies being investigated and as such, there was no reason to treat him as a suspect in a violent crime.  The Plaintiff points to the initial descriptions provided by the robbery victims of their attackers:  that they were young African-American males, approximately 17-18 years of age, wearing black hoodies and black pants.  They were also reported to be clean shaven and 5'6" to 5'8" tall.  Torres-Gomes, however, was Hispanic, wearing blue jeans and a long sleeve white shirt.  He had a goatee and was 34 years old at the time of this incident.  The Defendant states in his affidavit that he heard the description of the suspects and of the decedent over the radio but specifically did not hear that the decedent was described as Hispanic.  [Doc. No. 45]  Defendant White also states he believed the decedent to be black even while pursuing him.

9

[Doc. No. 45] Several of the other officers who provided affidavits said they too believed the decedent to be African-American. [Doc. No. 53; Doc. No. 75]

The Defendant also contends Torres-Gomes was a threat to him, the other officers in the area, and the persons passing by on the nearby highway which justified the use of deadly force. Defendant White's account of the shooting is that the decedent faced him, disobeyed his commands to "Stop" and "Halt", and was making motions with his hands under his shirt which indicated he had a gun. White contends this is sufficient evidence that the decedent was believed to have a weapon and be a threat to him and others justifying the use of deadly force.

The Plaintiff, however, points to facts that challenge Officer White's version of events. First, the Plaintiff suggests that the decedent never turned his shoulders square to officer White but instead only ran from him. In support of this contention, the Plaintiff points to the statements made by other officers who were at the scene. Sergeant Eubanks provided an affidavit which states:

> I observed the suspect who was wearing a long sleeve white shirt begin to run up the embankment in a westerly direction. He appeared to be headed back towards the traffic lanes of U.S. 169. The suspect was immediately east of the bridge as he ran up the embankment. As the suspect reached the top of the slope he suddenly dropped to the ground.
> [Doc. No. 42]

Also during this pursuit, officers in training Shea McClung and Shannon Martinez were driving northbound on 169 and saw Torres running along the east side of Highway 169. Officer in training Martinez wrote in a Tulsa Police Department Witness Statement:

> suspect went on to the grass area of the east side of Hwy 169 and north side of I-44 and running up the embankment. Suspect had his back towards me and his hands in front of him. I heard one shot and suspect fell to the ground. I was not able to see who shot the suspect.
> [Doc. No. 111-7]

Officer-in-training McClung's Tulsa Police Department witness statement also indicates she heard a shot from behind her and saw the suspect go down. [Doc. No. 111-8]

The Plaintiff makes note of the fact that in none of these eye witness accounts do the officers indicate that the decedent turned and looked at Officer White or turned his shoulders in a confrontational way to the Defendant. The Plaintiff contends that based on these statements, a reasonable jury could conclude that the decedent was merely fleeing and posed no threat to Officer White or the other officers in the vicinity.

Officer White also testified that the decedent's shoulders were square to him when he fired his weapon. [Doc. No. 111-3] In response, the Plaintiff not only points to the testimony of the eye witnesses, but provides a copy of the medical examiner's report which indicates that the bullet entry wound was in the center of the back of the decedent's skull. [Doc. No. 111-5] The Defendant admits that the entry wound is not inconsistent with his testimony as he testified the decedent was turning away from him when the gun was fired. [Doc. No. 111-3]

Accepting the Plaintiff's facts as true, this Court concludes that the Plaintiff has established sufficient evidence of a constitutional violation. A fleeing felon, who does not match the description of the violent suspects the police officers were tracking, who makes no threatening gestures or movements towards police or others other than to continue fleeing is not the type of suspect the law contemplates using deadly force against. Further, the forensic evidence coupled with the eye witness testimony creates a material issue of fact in dispute regarding whether the decedent was fleeing at all times or turned and confronted the Defendant.

Officer White also stated that he felt the decedent created a threat to others nearby since he was fleeing so close to the highway. Defendant states that he feared that if the decedent was allowed

to escape he would have been a threat to innocent persons passing by for fear that he would try to car jack someone to obtain a get-away vehicle. Defendant White claims the fear for the safety of others justifies the use of deadly force. The Plaintiff points out that by the time the Defendant fired his weapon the decedent had already crossed the interstate once and had not given any indication that he planned to hijack a car or cause any harm to the people driving on the interstate. As such, Plaintiff claims there was no justification for Defendant White's fears that the decedent was going to cause harm to the public. This Court agrees. Although the decedent *could* have been planning to cause harm to persons on the nearby highway by way of a car jacking, he showed no signs of intent to do so other than the fact he was running towards the highway. The Tenth Circuit addressed a similar situation in *Cordova*, 569 F.3d at 1190, where a police officer shot and fatally wounded the driver of a vehicle who was driving recklessly while fleeing. The Court stated:

> . . .We do not believe it would be reasonable for an officer to shoot any motorist who ran a red light or swerved through lanes, simply because reckless driving poses some threat of physical harm to a bystander who might be down the road. . . .
>
> To the extent that the district court held that the hypothetical risk Mr. Cordova posed to fellow motorists who might happen along was itself enough to render the shooting reasonable, it was in error. The threat must have been more than a mere possibility. The facts show that Mr. Cordova was driving recklessly down the wrong side of the highway. The facts do not, however, show that any other motorists were in the vicinity, or that other motorists would not be able to spot Mr. Cordova and avoid an accident themselves. Mr. Cordova's behavior did, of course, create risks for other motorists who might come along, but that risk of future harm was not enough to justify the near certainty of Mr. Cordova's death.

Such is the case here. The fear of Torres-Gomes car jacking a passer-by was only a hypothetical threat. The decedent was on foot and had previously crossed the interstate during the chase showing no signs of hijacking a vehicle or intending to cause any harm to the people traveling

on the highway other than the possibility that he would cause an accident by requiring people to stop to keep from hitting him. This alone was not enough to justify the use of deadly force.

Plaintiff also argues that it was unreasonable for Defendant White to assume Torres-Gomes had a weapon simply because his hands were either under his shirt or at his waistband. Plaintiff suggests other officers came to the conclusion that Torres-Gomes was simply trying to hold his pants up as he ran pointing to the statement of Officer Butler that ". . . I couldn't tell if he was holding up his pants or what, but he had. . .he had a grip on his pants or shirt right at his waist." [Doc. No. 111-13] Since possession of a weapon by a suspect is not alone enough to justify deadly force, *Harris v. Roderick*, 126 F.3d 1189, 1202 (9th Cir. 1997); see also *Haugen v. Brosseau*, 339 F.3d 857, 865 (9th Cir. 2003) *overruled on other grounds*, 543 U.S. 194, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ("the mere presence of a weapon does not justify the use of deadly force, let alone the potential presence of one."), and there is a disputed issue of fact as to whether the decedent turned to the officer in a manner that could be perceived as confrontational, this Court does not have to determine the sufficiency of the evidence regarding the officer's determination that the decedent had a weapon. The jury, as the trier of facts, will determine whether it was reasonable for Officer White to believe the decedent had a weapon and whether the decedent in fact made any confrontational actions towards the Defendant to make him fear for his safety and the safety of the other officers.

**C.    Was the constitutional right clearly established?**

Having determined that the Plaintiff has sufficiently alleged a constitutional violation, we now turn to the second prong of the qualified immunity analysis: asking whether existing case law gave the Defendant warning that his conduct violated the Plaintiff's constitutional rights. See

*Novitsky v. City of Aurora*, 491 F.3d 1244, 1255-56 (10th Cir. 2007). When conducting this inquiry, "[t]he central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.' " *Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer,* 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others. *See Garner*, 471 U.S. at 11. There is no doubt that *Graham, supra,* and *Garner, supra,* clearly establish the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. In *Garner,* the Supreme Court addressed a claim that the use of deadly force to apprehend a fleeing suspect who did not appear to be armed or otherwise dangerous violated the suspect's constitutional rights, notwithstanding the existence of probable cause to arrest. These cases set forth the general legal framework with regard to reasonableness in the Fourth Amendment context.

The Defendant, however, argues that the law is unclear regarding whether he was able to rely on the police dog's trace to the door to the apartment from which the suspect appeared as the sole evidence the decedent was in fact the suspect involved in the violent crimes he was investigating. Tenth Circuit case law is clear that it is the <u>totality of the circumstances</u>, not simply one factor that should factor into an officer's decision to use deadly force. *Thompson v. Salt Lake County*, 584 F.3d 1304, 1318 (10th Cir. 2009)("It is the totality of the circumstances that is the touchstone of the reasonableness inquiry.")

Further, the law is clear that before using deadly force an officer must have <u>probable cause</u> ". . .to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. . .". *Garner*, 471 U.S. at 11. "Thus, if the suspect threatens the officer with a weapon or there is <u>probable cause</u> to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id*. at 11-12. (Emphasis added)

The Tenth Circuit and the United States Supreme Court have defined probable cause as "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *Stauffer v. Zavaris,* 37 F.3d 1495 (10th Cir. 1994)(Unpublished) citing *Gerstein v. Pugh,* 420 U.S. 103, 111-12, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)).

The Tenth Circuit specifically addressed the issue of when an officer has sufficient probable cause to believe a fleeing suspect committed a crime that involved the infliction or threatened infliction of serious bodily harm such that deadly force would be justified in *Ryder v. City of Topeka*, 814 F.2d 1412, 1419-1421 (10th Cir. 1987). The suspects in *Ryder*, were involved in a plot to steal money from a Pizza Hut. The Court concluded that the officer had sufficient evidence to determine that the crime committed was simply a theft and not a violent crime such as robbery which would justify the use of deadly force. *Id*. at 1419. The Court further concluded that "we are unpersuaded by the argument that simply because Detective Meyer had probable cause to assume that the suspects might be armed, he could reasonably infer that the crime involved the infliction or threatened infliction of serious bodily injury." *Id*. at 1420. Although the Court acknowledged that "[c]ertainly, a police officer's knowledge that a suspect is in possession of a dangerous weapon is

a relevant and persuasive factor in determining whether the crime involved force or violence," they held that in this case, "Detective Meyer's knowledge that the suspects might be armed was insufficient, by itself, to overcome the overwhelming evidence that the crime was intended to be, and was, a non-violent one." *Id.* at 1420.

This Court finds that the law was clearly defined that before engaging in the use of deadly force the officer should have had probable cause to believe that the decedent either was engaging, or had engaged, in a violent crime or posed an immediate threat to the safety of the officer or the public. Probable cause has been sufficiently defined by this Court as well as the Tenth Circuit and the United States Supreme Court. Further, the standard for when it is reasonable to fire at a fleeing felon has been examined in depth by the Tenth Circuit and the United States Supreme Court. As such, this Court finds that the constitutional violation at issue was clearly defined at the time of Officer White's actions.

## CONCLUSION

For the foregoing reasons, the Court finds that Defendant's Motion For Summary Judgment is therefore **DENIED**. A Scheduling Order will be entered shortly regarding the schedule and deadlines for the remainder of the litigation.

James H. Payne
United States District Judge
Northern District of Oklahoma